[No. A024043. First Dist., Div. Three. Dec. 24, 1986.]

IVAN LEE SHAPIRO et al., Plaintiffs and Appellants, v.
TIEH MING HU et al., Defendants and Respondents.

COUNSEL

J. Michael Matthews for Plaintiffs and Appellants.

DeRonde & DeRonde and John A. DeRonde, Jr., for Defendants and Respondents.

OPINION

WHITE, P. J.—This appeal concerns the sale of an improved parcel of real property "as is." The purchasers, upon belatedly discovering that the building had serious defects in its basement and foundational walls, sued the vendor for breach of contract, rescission, fraud and misrepresentation. Following a jury verdict for the purchasers on the breach of contract cause of action and subsequent posttrial motions, the trial court issued an order effectively granting judgment for the vendor notwithstanding the verdict. We affirm.

I

Appellant Ivan Lee Shapiro (Lee) is a licensed real estate salesman, and a partner in a real estate brokerage firm located in Concord. For several

years prior to the events at issue here, he and appellant Bernard Rawitch had also been in the business of operating a small chain of hot dog restaurants. In 1980, Lee decided to bring his brother Harvey into the hot dog restaurant business with him. Thereafter, Lee began looking for a location to open a new restaurant.

Through the commercial multiple listing service, appellants learned about a building on a commercially zoned lot on Monte Vista Avenue in Vacaville, in the vicinity of a McDonald's hamburger restaurant and several other fast food franchise outlets. Feeling that such a location would be "perfect" for his planned hot dog restaurant, Lee immediately called Edna Carvin, the real estate broker with the listing on the subject property. Lee told Carvin what he wanted to use the property for. In response to his questions, Carvin told Lee that the property was still available, that there was a Contra Costa County Board of Realtors lock box on it, and that he could "go up and look at it." Lee "immediately" drove out to look at the property. He was able to obtain access to the building because, as a realtor himself, he had a key to the lock box.

Already sensing that the property's location was ideal for his planned hot dog restaurant, Lee was even more pleased to note that there was a McDonald's restaurant right next door, a couple of other fast food restaurants in the vicinity, and a "giant" parking lot in back of the building. Lee went inside and spent between 45 minutes and an hour inspecting the property. Everything he saw was, he felt, "natural" or "ideal" for his planned restaurant. The only negative thing he noticed was in the back of the building, under a flat roof apparently added onto the structure, where some acoustical tiles were hanging down and appeared stained or water damaged. Lee was uninterested in the condition of the building in terms of carpeting and painting, since he intended to replace the flooring and repaint as part of the process of transforming the building into a restaurant. He went down the inside basement stairs, but did not go more than one step into the basement, which was "pitch black." However, he could see "[d]ebris of some sort" on the ground. After inspecting the building, Lee walked around the neighborhood and "checked out" the McDonald's "to see what kind of activity they had." He was "real excited," and convinced that "[t]hat was the spot" for his restaurant.

Lee drove back to his office, immediately contacted his brother Harvey and his partner Rawitch, and described the property to them as "perfect to do the hot dog restaurant in." They discussed how to go about making an offer and what their ownership shares would be. Lee then prepared an offer on the property, which included a provision for a pest control inspection to be paid by the seller. After telephoning Carvin, Lee immediately drove to

her office in Danville to present the offer. Within a day or two, Carvin called back to inform Lee that the owner of the property, respondent Tieh Ming Hu, had made a counteroffer. The written counteroffer included a higher downpayment, and added a specific statement that the building was to be sold "as is." Lee testified that in his experience as a real estate agent, he had thought that an "as is" condition on sale of property was valid only if preceded by a specific statement of what was wrong with the property.

After receiving and reading the counteroffer, Lee asked Carvin about the "as is" provision. According to Lee's testimony, she told him that Hu did not want to do the termite inspection, and that there was a problem with the flat roof in the back of the building, which had been patched where the tiles were loose. Otherwise, in response to Lee's question whether there was anything else she or the sellers were aware of that was wrong with the building, she said "Absolutely no."

Carvin testified that Hu had told her about the leak in the roof, and that she had inspected the property. In the original listing for the subject property, there was a statement that the property had "super potential for [a] restaurant"; however there was also a notice that the structure was to be sold "as is." Carvin testified that Hu did not tell her about any water problems in the basement; that she "looked in" the basement but did not go in; that she saw no evidence of any problems there; that she did not recall seeing any debris in the basement; that "it was not dark" in the basement but was "light enough" to see; that she did not see anything in the basement that gave her cause to think she ought to make further inquiry into the condition thereof; that Hu told her he wanted to sell the property "as is" because he did not want to make any repairs at the price he was going to list it for; that Hu specifically did not want to make any roof or termite repairs; that she was aware that if a person selling property knew of any problem with it, he or she had to disclose it; and that she would not have accepted the listing if she felt there was any problem with it. In contrast to Lee's testimony, Carvin stated that she had discussed the fact that the property was being offered for sale "as is" the first time Lee called her up about the listing, and that she had told him at that time that "he should go out and look at it" himself. She also told him in response to his questions about the "as is" condition that Hu did not want to do termite work or pay for roof repairs; that otherwise she did not know of any problems with the property; and that she did not learn of any problems in the basement until later, after the instant dispute arose. Carvin testified that she felt the property had excellent potential for a restaurant because of its location; and that the land was more valuable than the building on it.

After his discussions with Carvin about the "as is" condition on the sale of the property, Lee again discussed the purchase with his brother and

Rawitch. According to his testimony, he then called Carvin again and asked her to inquire of her clients specifically if there were any defects in the building. Shortly thereafter, she called him back and told him that there was nothing the sellers were aware of, but that they would not pay for a termite report. Lee testified that he and the other purchasers "felt okay" about not having a termite inspection, because they "were real excited about the property," which "was just perfect for us and we felt if there was some termite work in it, we could have a handyman repair" it. Thereupon, on or about June 20, 1980, appellants signed and accepted the sellers' counteroffer and transmitted it back to Carvin. Carvin testified that she did not recall whether or not Lee made a telephone call to her specifically requesting that she contact the sellers to see if they knew of any problems with the property.

Appellants opened an escrow, which did not close until September 12, 1980, nearly three months after the date of the contract of sale. The escrow instructions, prepared by Lee, stated "No termite inspection is required—I accept roperty in its [*sic*] 'as is' condition." During the escrow period, Lee drove by the property several times and went back in once more, this time with Rawitch. Both Rawitch and Lee testified that they did not go into the basement because there was no light or power in the building so they could not see it. Rawitch also testified that there was debris on the floor of the basement.

Appellant Harvey Shapiro never saw the property before the close of escrow. In August, Harvey moved to Vacaville from Southern California. After the close of escrow, Harvey began active preparations to build and operate the hot dog restaurant. He went into the building and looked around, but did not go into the basement because it was too dark and there was still no electrical power. A few days later, he went back to the property with a flashlight and entered the basement. Although there was a side door and a window, no light could enter the basement through them because the window was blocked by stacks of boxes and the door was nailed shut. He found boxes, wood and paneling in the basement, but did not discover any problems or defects at that time. Subsequently, in the course of installing new electrical connections, cleaning up and repairing the building, a large bulge was discovered in the south wall of the basement, which was built of cinder blocks. This bulge had previously been hidden by paneling stacked up along the wall.

After Harvey had discovered the bulge in the basement wall and had told Lee and Rawitch about it, appellants stopped their preparations for the hot dog restaurant and obtained an estimate for the cost of repairing the cellar. They contacted Albert Damiano, a Vacaville city building inspector, who told them that the wall could be braced. Damiano also testified at trial that

the bulging in the south wall of the basement would have to be braced with a "T-wall," essentially another wall holding the foundation in place. This technique would have brought the structure into compliance with the building code and rendered it suitable for commercial use.

At trial, there was conflicting testimony on the cost of repairs. Appellants' expert witness, architect Peter Shutts, testified that in order to repair or correct the structural problems in the building's basement it would be necessary to remove the bulging wall entirely and build a new one, together with a drainage system, at a total estimated cost of $38,000. However, he also testified that in view of the inadequate cinder block construction of the entire foundational retaining walls, it would probably have been necessary to rebuild the entire foundation, at a cost of between $50,000 and $60,000. Respondent's expert, Paul Boykin, a general contractor, testified that all that was necessary was to brace the walls in the manner indicated by Damiano, at an estimated cost of only $2,000; he further testified that replacing an entire wall would only cost approximately $4,000 to $6,000. However, under cross-examination, he testified that it would require much more extensive work to install a drainage system to relieve the pressure on the cellar walls.

II

Appellants served a notice of rescission on respondents and filed suit. Their first amended complaint set forth causes of action for breach of contract, fraud, negligent misrepresentation, rescission, reformation, injunctive relief and damages. At trial, the issues of breach of contract, fraud and negligent misrepresentation were submitted to the jury, while the causes of action for rescission and reformation were reserved for the court. At the close of trial, the jury submitted a special verdict finding that there had been no fraud or misrepresentation on the part of respondents, but that they had breached their contract with appellants. The jury awarded appellants damages in the amount of $65,841.52.

After the verdict, appellants requested a ruling on the issue of rescission from the court; the court in turn requested that the parties explore the possibility of settlement. Thereafter, respondents moved for a new trial and a judgment notwithstanding the verdict, while appellants filed a motion to amend the complaint to conform to proof together with memoranda regarding the remaining issues still pending before the trial court. Appellants sought to amend their complaint to state failure of consideration and mistake as additional grounds for rescission.

The parties having failed to settle, the court heard argument; on July 13, 1983, it entered an order denying appellants' motion to amend, striking the

jurors' affidavits stating their rationale for the award of damages, denying respondents' motion for judgment notwithstanding the verdict, and granting respondents' motion for a new trial on ground of insufficiency of the evidence to justify the verdict and excessive damages.

In its specification of reasons for its decision, the court stated that "the jury should not have found that [appellants] were entitled to damages in the sum of $65,841.52, or in any sum"; that the contract between the parties contained no express or implied warranties that the subject property was usable for commercial purposes; that since the property was sold in "as is" condition, the sellers were relieved of any obligation to repair the property prior to delivery to the buyer, unless the sellers had through fraud or misrepresentation intentionally concealed material defects which they were under a duty to disclose to the buyer; that the jury's finding that there was no fraud or misrepresentation on the part of respondents "cut out from under [appellants] the only contention . . . upon which they could possibly recover"; and that under the circumstances, there could be no breach of contract and the jury therefore erred in awarding damages. In addition, the court denied appellants' cause of action for rescission and restitution "on grounds the Court agrees with the jury there was no fraud, misrepresentation or concealment of defects that defendants were under a duty to disclose to [appellants]; there was no failure of consideration or mistake. [Appellants], experienced business and real estate men, had ample opportunity to satisfy themselves as to the integrity of the building before close of escrow. The Court can find no good cause to set aside the sale."

Thereafter, respondents moved for clarification of this ruling and for reconsideration of the order denying the motion for judgment notwithstanding the verdict. ■ ■■ ■■ ■ On September 26, 1983, the court issued an order granting respondents' motion for reconsideration of the earlier order denying respondents' motion for judgment notwithstanding the verdict.[1]

## III

■ Appellants now seek reinstatement of the jury verdict in their favor with an order remanding the matter to the trial court for determination of interest, costs and attorney fees, on grounds that the trial court erred in

---

[1]The court's order in this regard was singularly opaque. It states: "Reconsideration having been given to the Court's ruling denying [respondents'] motion for Judgment Notwithstanding the Verdict and, [¶] FOR GOOD CAUSE SHOWN, [¶] IT IS HEREBY ORDERED THAT said motion of denial shall be, and it is, hereby GRANTED." Although it is far from clear what a "motion of denial" is, both parties have interpreted this order as one in effect granting the earlier motion for judgment notwithstanding the verdict. For purposes of this appeal, we accept this interpretation.

granting the judgment notwithstanding the verdict. Failing this, they urge that the trial court abused its discretion in denying their motion to amend their complaint to conform to proof, in failing to enter judgment of rescission and restitution in the amount of the jury's award of damages, and in excluding certain evidence relating to appellants' cause of action for fraud and misrepresentation. We conclude that there was no error on the part of the trial court and therefore affirm.

■ There are no warranties of quality or condition implied in the sale of real property. (*Gustafson* v. *Dunman, Inc.* (1962) 204 Cal. App.2d 10, 13 [22 Cal.Rptr. 161].) Under Civil Code section 1113, any grant or conveyance of real property implies only two covenants, "and none other": that the grantor has not previously conveyed the same estate or any interest therein to another person; and that the estate is free from any encumbrances brought about by the grantor or any person claiming under him. Any other covenant or warranty must be expressly made. (3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 87, p. 1841.)

■ As the trial court correctly pointed out in its decision of July 13, 1983, the salient fact of this case is that it concerns an "as is" sale. ■ In contrast to the sale of personal property or chattels, the law governing sales of real property has long been that of caveat emptor, with the buyer assuming the risk on quality or condition of the property, absent express warranty, fraud or misrepresentation. (*Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 377 (115 Cal.Rptr. 648, 525 P.2d 88].) ■ Although this doctrine has been eroded in the context of the sale of new construction (*id.,* at pp. 377-380), no warranty of quality could apply to the instant case for at least two reasons: the construction at issue was not new; and the sale was expressly on an "as is" basis—that is, in its present observable state and condition and with no implied warranties as to quality or condition whatsoever. (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 740-742 [29 Cal.Rptr. 201, 8 A.L.R.3d 857]; 2 Witkin, *op. cit. supra,* Sales, § 77, p. 1147.)

Appellants contend that the "as is" condition on sale does not protect the sellers in this case, because it serves "to discharge warranties only for defects which are visible or observable. Warranties for non-visible or unobservable defects would not be discharged." Arguing that the bulge in the basement wall was not "visible or observable" because of the darkness in the basement, the debris on the floor and the paneling stacked against the wall, appellants urge that the "as is" condition on sale did not relieve respondents from liability for statements in their listing or by their real estate agent to the effect that the property had "super potential" for a restaurant and that

the "as is" condition purportedly only applied to the roof and to the termite inspection.

This argument is wrong for several reasons. First, an "as is" provision in any sale puts potential buyers on notice that the seller makes no warranties about the quality or condition of the thing sold. In practice, it serves as a kind of "red flag" warning the buyer that the goods or property to be sold may not be in perfect condition or of ideal quality. As pointed out by the trial court in its decision, appellants were themselves businessmen and real estate agents who could be expected to be aware of the meaning of an "as is" sale, and who should have taken precautions to check out the building thoroughly before buying it. Certainly nothing prevented them from at least undertaking a termite inspection, a routine step in any sale of real property. In this case, such an inspection would probably have revealed the problem in the basement wall prior to close of escrow. Appellants' own testimony in the record indicates that in their excitement and haste to purchase the subject property, they made a conscious decision to forego an inspection on the assumption that any problems that might turn up could be inexpensively fixed by a "handyman."

Second, the building at issue was not a new construction. Assuming for the sake of argument that the bulge in the foundational wall qualifies as a "non-visible or unobservable defect," under Civil Code section 1113 there were nevertheless no implied warranties as to the quality or condition of this building. Thus, the only "warranties" which would not be discharged by the "as is" clause for the assertedly "non-visible or unobservable defects" at issue here would be the alleged "express warranties" made by respondents' agent and in their listing statement. However, the statement that the property had "super potential for [a] restaurant" refers primarily to its site adjacent to many other eating establishments; in conjunction with the express "as is" statement regarding the condition of the building, it cannot be construed to constitute a warranty that the building had no defects. Similarly, it is clear from the transcript that agent Carvin urged appellants to look over the property themselves, informed them of possible problems with the roof, and indicated that respondents would not be responsible for any termite inspection. These statements certainly do not in themselves constitute a warranty that the property sold "as is" was otherwise free of defects.

Most importantly, however, appellants have misstated the principle on which they rely. As the trial court correctly stated, any sale of property "as is" is a sale of the property in its "present or existing condition"; the use of the phrase "as is" relieves a seller of real property from liability for defects in that condition. The only exception to this principle is when

a seller, through fraud or misrepresentation, intentionally conceals material defects not otherwise visible or observable to the buyer. (*Lingsch* v. *Savage, supra,* 213 Cal.App.2d at pp. 740-742.) Appellants have cited no cases, nor have we found any, in which a person selling real property "as is" was liable for defects in the quality or condition of the real property, where the property was not new construction, and the sale was made in good faith and without some form of fraudulent misrepresentation or concealment. Here, the jury found that respondents had committed no fraud or misrepresentation in the sale of the subject property; the trial court expressly agreed with that finding, which was supported by substantial evidence in the record. Thus, in the absence of fraud or misrepresentation on the part of respondents, the mere fact that the bulge in the foundational wall was not readily observable does not render the "as is" condition on sale meaningless or inoperable in this case.

Under these circumstances, appellants' purchase of the property at issue "as is" relieves respondents of any liability for the defects in the cellar wall. All of appellants' grounds for alleged breach of contract are premised on some form of breach of warranty, fraud or misrepresentation, mistake or failure of consideration. Because of the "as is" clause and the lack of any fraud on respondents' part, none of these grounds—including those grounds which appellants belatedly and tardily sought to add to their complaint *after* the jury verdict—have any substance. As a matter of law, there were therefore no grounds for finding breach of contract or granting rescission.

 The power to grant a motion for judgment notwithstanding the verdict is the same as, and no broader than, the power to order a nonsuit or directed verdict. (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 435, pp. 433-434.) Such a motion may be granted only when, disregarding conflicting evidence, giving to the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines that there is no evidence of sufficient substantiality to support a verdict in favor of the nonmoving party. (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; 7 Witkin, Cal. Procedure, *op. cit. supra,* Trial, § 409, pp. 412-413.) Such was the case here.

## IV

 Appellants contend that the trial court committed error in excluding certain evidence relating to respondents' actual or constructive knowledge of defects in the subject property. This evidence consisted of letters from an

attorney for some of respondents' earlier tenants on the subject property. After reviewing the letters, the trial court excluded these as irrelevant and prejudicial under Evidence Code section 352. Appellants now argue that had these letters been admitted, it is "reasonably probable" that the jury would have found fraud on the part of respondents.

The contention is meritless. The letters themselves were from an attorney for tenants fighting an attempt by respondents to secure unpaid rent. They were written in the context of separate litigation, and were from persons not parties to the instant action. The complaints raised in the letter concerned water damage, leaks in the roof, dry rot, and other problems which appellants either were aware of, had been expressly told of, or were readily observable on inspection of the premises. The questionable relevance and unquestionably prejudicial nature of the proffered evidence is apparent on the face of the record. The trial court did not abuse its discretion in denying the admission of these letters.

In view of our decision, we need not address appellants' contention that the trial court abused its discretion in denying their motion to amend their complaint to conform to proof or in failing to enter a judgment of rescission and restitution.

The judgment is affirmed.

Scott, J., and Merrill, J., concurred.

A petition for a rehearing was denied January 23, 1987, and appellants' petition for review by the Supreme Court was denied March 11, 1987.