## Frost v. Bank One of Fremont
[Cite as 7 AOA 179]

Case No. S-89-32
Sandusky County, (6th)
Decided September 28, 1990

Drew A. Hanna, for appellant.

William R. Bowlus, for appellee Bank One.

Anthony A. Chudzinski, for appellee James J. Klingman.

Per Curiam.

This is an appeal of a judgment of the Sandusky County Court of Common Pleas which granted a directed verdict in favor of defendantsappellees, Bank One of Fremont ("Bank One") and James J. Klingman. From that judgment, plaintiff-appellant, John S. Frost, filed a timely notice of appeal and asserts as error:

"1. It is error for the court to find the Plaintiff had failed to establish the Defendants had made an unreasonable use of Lot 17, or that they blocked a natural water course. (Final J.E. Finding 2, Page 2, copy of the J.E. attached in the Appendix herein.)

"2. It is error for the court to find the Plaintiff had failed to prove the Defendants had created a nuisance. (Final J.E., Finding 3, Page 2.)

"3. It is error for the court to find Defendants made no express or implied warranties, made no material misrepresentations, and did not violate any duty to disclose hidden defects, in connection with the sale of Lot 18 to the Plaintiff. (Final J.E., Findings 1 & 3, Page 2.)

"4. It is error for tlie court to find Plaintiff failed to establish any damages resulting from the acts of the Defendants. (Final J.E., Finding 4, Page 2.)

"5. It is error for the court to find Plaintiff failed to mitigate his damages, by refusing Defendant's offer of settlement. (Final J.E., Finding 5, Page 2.)

"6. Because of the incorrect Findings by the Court, it is error for the granting of a directed verdict and dismissal of this action."

This case arises from the following undisputed facts. Klingman owned and began the development of a residential subdivision, River Run Estates ("River Run"), during the 1970's. In 1976, the property in dispute was platted and divided into lots. Lots 17, 18 and 19 of the proposed subdivision consisted of a steep hill leading down to a relatively flat portion of land and a creek. The creek was at the base of the hill and flowed in a west/northwest direction as did the surface water coming off the hill. At some point during 1977-1978, while the property was owned by Klingman, the creek was filled in so that street access to Lots 17, 18 and 19 could be had from a cul-de-sac at the base of the hill. In order to provide drainage from the hill a swale was constructed on Lot 18 which ran from west to east across Lot 17. Some of the water draining from Lot 18 would then cross over onto Lot 17. The remainder drained to the

west across Lot 19. None of these three lots was sold or developed for the following ten year period. In 1985, Bank One, by means of a foreclosure action against Klingman, obtained ownership of, among others, Lots 17, 18 and 19 in River Run.

On February 13, 1987, appellant purchased Lot 18 from Bank One for $14,250. He subsequently constructed a house on that lot and resided in that home from January 1988 until the time of trial.

On April 4, 1988, appellant filed a civil complaint alleging that appellees had "unreasonably and negligently" blocked a natural watercourse on Lot 17 by "raising" the level of the lot and flooding appellant's property. In this complaint, appellant further asserted that appellees had trespassed upon Lot 17 and created a nuisance by blocking the watercourse. Appellant characterized said conduct as "reckless" and malicious. The complaint requested that appellees be ordered to lower the elevation of Lot 17, that they be enjoined from raising the level of Lot 19, and that appellant be awarded compensatory and punitive damages. An amended complaint, filed on October 19, 1988, reiterated the claims of the first complaint but, also, added allegations founded upon breach of warranty and misrepresentation. Both defendants-appellees answered the complaint.

A jury trial commenced in June 1989. During the course of the presentation of plaintiff's case, much evidence was adduced relative to the nature of the terrain on Lots 17, 18 and 19; the circumstances leading to appellant's purchase of Lot 18; the events leading to the filing of appellant's cause of action and appellant's consequent "damages." Facts material to each assigned error shall be disclosed during our consideration of that error.

At the close of plaintiff-appellant's case-in-chief, appellees moved for a directed verdict. The trial court granted that motion based upon a lack of evidence.

Civ. R. 50(A) (4), which provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

See, also, *Waller v. Mayfield* (1988), 37 Ohio St. 3d 118, 121.

In determining a motion for a directed verdict, the trial court is not permitted to weigh the evidence or question the credibility of the witnesses. *Ruta v. Breckeridge-Remy Co.* (1982), 69 Ohio St. 2d 66, 68-69. Rather, the court must determine that only one result could be reached under the theories of law presented in the complaint. *Id.*, at 69. Therefore, a motion for a directed verdict presents a question of law, not a question of fact. *Id.*, at paragraph one of the syllabus. Nonetheless, the trial court is permitted to review and consider the facts in determining the motion and may draw any reasonable inference predicated on those facts. *O'Day v. Webb* (1972), 29 Ohio St. 2d 215, 219; *Rhinehart v. Toledo Blade Co.* (1985), 21 Ohio App. 3d 274, 275.

Prior to our review of appellant's assignments of error, the status or relationship of the defendants-appellees must be considered. Appellant asserts that Klingman was an agent of Bank One. Bank One admits to authorizing the grading of Lot 17 but denies any agency-principal relationship between Klingman and itself.

The relationship of principal and agent exists only when one party exercises the right of control over the actions of another and those actions are directed toward the attainment of an objective which the former seeks. *Hanson v. Kynast* (1986), 24 Ohio St. 3d 171, paragraph one of the syllabus. Thus a principal-agent relationship between Klingman and Bank One can be found only if there was evidence adduced showing that Bank One had control of Klingman's actions and that the actions taken by Klingman were directed toward the attainment of an objective by Bank One. If these facts were established, Bank One would be liable to appellant for damages resulting from wrongful acts done within the scope of Klingman's authority. *Hester v. Church's Fried Chicken* (1986), 27 Ohio App. 3d 74. In addition, conduct of the agent which consists of willful and malicious acts are considered to be outside the scope of his authority. *Id.*, citing *Finley v. Schuett* (1982), 8 Ohio App. 3d 38, at 39. Thus, absent ratification or authorization of malicious conduct, the principal cannot be held liable for damages caused by such conduct on the part of his agent. *Id.*

In this case, the evidence clearly showed that Klingman acted as an agent of Bank One

for the limited purpose of the grading of Lot 17. As will be discussed below, no evidence was presented by appellant indicating that Klingman committed any wrongful conduct in carrying out Bank One's objective in the grading of that lot. As to appellant's otrier accusations of willful and malicious vandalism and harassment on the part of Klingman, no evidence was offered showing that a principal-agent relationship existed between Klingman and Bank One or that Bank One ratified this alleged conduct. Moreover, those acts alleged by appellant would fall outside Klingman's scope of authority as an agent of Bank One. The trial court found and, we agree, that appellant failed to produce any evidence showing that Klingman created a nuisance, blocked a "natural watercourse," or intentionally caused a blockage of appellant's tile drain. Therefore, the majority of our discussion, with one exception, shall be directed at appellant's complaint as against Bank One.

In his first assignment of error, appellant contends that appellee, Bank One, engaged in an unreasonable use of Lot 17 by blocking a "natural watercourse" thereby causing flooding on appellant's land.

During the course of plaintiff-appellant's case-in-chief, the following facts relevant to this assigned error were adduced.

Testimony from several witnesses at trial established that the land comprising Lots 17, 18 and 19 was wet and "marshy" and contained many springs emanating from the hillside. Water from these springs, as well as rainwater, flowed down the hill in a westerly to northwesterly direction and were drained away by the creek at the base of the hill.

Frank Cicanese, a contractor, testified that he was involved in the creation of the swale after the creek had been filled. He stated that the purpose of the swale was to "temporarily" divert some of the surface water from Lot 18 across the base of Lot 17 to a rerouted creek or ditch lying to the east of Lot 17. However, Cicanese also stated that the ditch was not completed at the time of his work on the property' and could not attest to the fact that surface waters from Lot 18 had ever drained east by means of the swale onto Lot 17 and into the ditch.

As mentioned previously, the swale, or depression, remained unimproved for approximately the next ten years. Robert J. Cominsky, a longtime resident of River Run, testified that the land at the base of Lots 17, 18 and 19 was continually wet and marshy during that period, that wetland vegetation was present on all three lots, and that each lot contained pools or ponds of standing water.

John Frost provided the following relevant testimony.

Prior to and at the time of his purchase of Lot 18, appellant was aware of the wet and marshy conditions on that particular lot. Appellant had inspected the lot several times before he purchased it. Appellant described the base of Lot 17 as a "swamp" with little or *no* discharge into the ditch east of that lot. In order to provide better drainage from one of the springs just above the site of his future home, appellant dug a "trench" from just below the level of the spring eastward across Lot 18 and *onto* Lot 17. Tile was placed in the bottom of the trench. Subsequently, a retaining wall was constructed and the water piped from that area across and onto Lot 17.

On June 17, 1987, appellant discovered that Lot 17 had been leveled and graded causing flooding in his excavation for the retaining wall and his "trench." Appellant testified that, in his opinion, fill had' been brought to Lot 17 in order to raise the level of that lot. Phillip Willis, an excavating contractor, stated, however, that he only graded the dirt on the lot and leveled it. Klingman also testified that no extra fill dirt had been transported to and placed upon Lot 17.

On June 17, appellant spoke with Robert Fuchs, Vice-President of Bank One, and a drain tile was installed on Lot 17 which directed the water draining from Lot 18 to a catch basin in the cul-de-sac. Subsequently, the township also placed a catch basin in the right of way which carried away surface waters from all three lots. Appellant conceded that the tile took care of most of the water draining from his property and also admitted that because he wanted to "control" the drainage, he again diverted water from the spring behind his homesite onto Lot 17. Appellant subsequently installed a catch basin to drain the water from that particular spring. Appel-lant testified that any flooding which later occurred on his property resulted from alleged acts of "vandalism," *i.e.*, deliberate blockage of the tile on Lot 17. Appellant accused Klingman individually and as agent of Bank One of intentionally blocking this drain tile. However, as stated previously, no one,

including Frost, ever saw Klingman engage in the alleged misconduct, and Klingman denied the allegations.

Appellant insisted that the surface water from his land drained naturally eastward through the swale. Nonetheless, Cominsky testified that after the creek bed was filled, "a lot of water drained down the hill" and rested at the bottom of *both* Lots 17 and 18. Cominsky specifically stated that he did not notice water flowing eastward from Lot 18 to Lot 17 until after appellant dug out his "trench." Phillip Willis observed that Lot 17 had no opening into the drainage ditch on the east of the property and disclosed that the only water flowing onto Lot 17 from Lot 18 at the time that the property was graded came from appellant's man-made "trench." Appellant proceeded to construct his house, including a basement, on Lot 18 and, as of time of trial, could cite no instances of flooding or other water problems since he had resided in that home.

Appellant asserts that the swale created to divert surface waters from Lot 18 constituted a "natural watercourse" which could not be blocked by the adjoining landowner on Lot 17.

A swale is a "low-lying or depressed and often wet stretch of land." Webster's Ninth New Collegiate Dictionary (1989) 1190. Generally, a swale is not considered to be a watercourse. *Bey v. Wright Place, Inc.* (1956), 108 Ohio App. 10, 12 and 14. See, generally, 92 Ohio Jurisprudence 3d (1989) 345-346, Water, Section 1; 78 American Jurisprudence 2d (1975) 450, Waters, Section 6. But, see, *McCoy v. Rankin* (1941), 35 Ohio Law Abs. 621. In this case, the swale at the base of the hill could in no way be deemed a watercourse. A watercourse is defined as a "stream of water flowing in a definite channel, having a bed and sides or banks, and discharging itself into some other stream or body of water." *Bey, supra;* 92 Ohio Jurisprudence 3d, *supra.* The evidence, as recited above, produced by appellant at trial on this matter simply did not show that this swale met the definition of a watercourse. Thus, the resolution of this cause is governed by the legal principles applicable to surface waters.

Surface waters are those waters which are diffused over the surface of the ground, derived from falling rains and melting snows or which rise to the surface in springs, and continue to be such until it reaches some well-defined channel. See, generally, Restatement of Torts 2d 199, Section 846; 78 American Jurisprudence

2d (1975) 561, Waters, Section 117. See, also, *Persin v. Youngstown* (1949), 57 Ohio Law Abs. 560, 568.

The rule in Ohio regarding the resolution of surface water disputes was enunciated in *McGlashan v. Spade Rockledge Corp.* (1980), 62 Ohio St. 2d 55, at the syllabus, as:

"*** [A] possessor of land is not unqualifiedly privileged to deal with surface water as he Pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable. (*Butler v. Peck*, 6 Ohio St. 334, and its progeny, overruled to extent inconsistent herein.)"

In construing the evidence in a light most favorable to appellant, we will assume for the purposes of our discussion that some of the surface water on Lot 18 flowed *naturally* east onto Lot 17. Nevertheless, even in making this assumptin reasonable minds could only conclude that appellees' grading of the lot was a "reasonable use."

In *Lunsford v. Stewart* (1953), 95 Ohio App. 383, in a factual context identical to the case before us, the court found that, in an urban setting, an owner of a lot which receives surface water from an adjoinirig lot may grade and fill his property for a reasonable use without incurring liability in favor of the adjoining owner. See, also, *Keiser v. Mann* (1956), 102 Ohio App. 324, 326-327. Under the foregoing case law it was incumbent upon the appellant to produce evidence proving that appellee, Bank One, filled and graded its land for an unreasonable use. In determining whether the use was reasonable it must be determined whether the gravity of the harm caused by the interference with the flow of the water outweighed the utility of the interferer's conduct. *McGlashan, supra*, at 59-60; *Keiser, supra*, at 327. Appellant offered no evidence to prove that Bank One had unreasonably elevated Lot 17 for an unreasonable purpose. Rather, the evidence showed only that the property was graded for a reasonable use-- sale as residential real estate, that a drain was installed, and that appellant suffered negligible harm. Accordingly, appellant's first assignment of error is found not well-taken.

In his second assignment of error, appellant contends that blockage of the surface waters constituted a nuisance.

A private nuisance is generally defined as that which interferes with another's possession of his property causing an appreciable, substantial, tangible injury resulting in an actual, material and physical discomfort. *Rautsaw v. Clark* (1985), 22 Ohio App. 3d 20, 21; *Patton v. Westwood Country Club Co.* (1969), 18 Ohio App. 2d 137, 140-141; *State, ex rel Chalfin v. Glick* (1960), 113 Ohio App. 23, 26. In a case, such as the one before us, involving adjoining landowners, the major question is whether the defendant in a nuisance action put his property to a reasonable use under the circumstances. *Antonik v. Chamberlain* (1947), 81 Ohio App. 465, 476-477. See, generally, 2 Ohio Jurisprudence 3d (1977), Adjoining Landowners, Section 3.

We have already determined that appellee's use of Lot 17 was reasonable under the circumstances. In addition, we are of the opinion that appellant failed to provide any evidence showing that he suffered any appreciable tangible injury as the result of the flooding on June 17, 1987. The excavation for his retaining wall and his drainage "trench" were flooded. Viewing the facts in a light most favorable to appellant, reasonable minds could only conclude that Frost caused the flooding himself by creating the man-made "trench" to divert waters onto Lot 17 and that it was this water that was thrown back onto Lot 18 causing the flooding. As to any subsequent flooding, in July 1987, appellant failed to demonstrate that the alleged misconduct of appellee Bank One or appellee Klingman caused that flooding. Accordingly, appellant's second assignment of error is found not well-taken.

Appellant's third assignment of error addresses the directed verdict in favor of appellees on the issues of breach of warranty, misrepresentation, and breach of duty to disclose a "hidden defect."

Appellant asserts that he established a prima facie case sounding in express or implied warranty of fitness for a particular purpose and misrepresentation by producing evidence that appellee, Bank One, made representations that Lot 18 was suitable for residential purposes. He also contends that the trial court erred in finding that Bank One had no duty to disclose a latent defect, that is, the filled creek bed.

The following facts are pertinent to a consideration of this assigned error.

Appellant first became interested in purchasing Lot 18 in 1986. He testified that part of his attraction to this particular property was due to the water conditions on that lot. Frost stated that when Bank One obtained ownership of River Run, blue and white signs containing *only* a telephone number and the words, "For Sale," were placed upon the lots.

At the time of closing appellant was shown a restrictive covenant, which contained the following material clause:

"Each Lot shall be used only for residential purposes and no other purposes."

Appellant first attempted to erect a retaining wall on his property in April 1987. However, the contractor in charge of the excavation refused to finish the job due to the unstable condition of the ground, that is, he feared a mud slide. In the latter part of April 1987, Cominsky informed appellant that the area where appellant wished to construct his house was a filled-in creek bed. In May 1987, appellant engaged the services of a consulting engineering firm to determine the feasibility of building his house and retaining wall on the site of the old creek bed. It was determined that, with certain changes and additions, a residence could be built at that location. Appellant subsequently modified his house plans, to include a poured, rather than cement block basement, and constructed his home on the creek bed. Appellant admitted in his testimony that both the house and basement are dry and that he has no water problems or problems caused by subsidence in the creek bed.

There are no warranties of quality or condition implied in the sale of real property. *Kerr v. Parsons* (1948), 83 Ohio App. 204, 208. The law governing sales of real property has long been that of *caveat emptor, Traverse v. Long* (1956), 165 Ohio St. 249, with the buyer assuming the risk on the quality or condition of the property, absent express warranty in the deed or misrepresentation. See *Waters v. Novak* (1953), 94 Ohio App. 347, 348-349. See, also, *Shapiro v. Hu* (1986), 188 Cal. App. 3d 324, 233 Cal. Reporter 470. See, generally, 77 American Jurisprudence (1975), Vendor and Purchaser, Sections 329, 336. One of the exceptions to the "no warranty" rule occurs when the written executory contract for the purchase of land includes an express warranty on the seller's part as to the physical quality or condition of

the land. In such cases, the seller can be found liable on the guaranty of quality. *Boyd v. Miller* (1855), 3 Ohio Dec. Rep. 317.

In the instant case, a review of the record discloses that no express warranties of the suitability of Lot 18 for a residential purpose were ever made to appellant. Such a warranty cannot be implied from the fact that appellant was advised of a restrictive covenant requiring that the real estate be used "for residential purposes only." *Kerr, supra.* Hence, unless appellant produced evidence of a prima facie case of fraud or misrepresentation, the doctrine of *caveat emptor* applies, and the trial court did not err in granting a directed verdict on this issue.

Where conditions on property are open to observation and the purchaser has had the opportunity to investigate and inspect without hindrance by the seller, the purchaser has no cause of action against the seller, that is, the rule of *caveat emptor* applies. *Traverse, supra,* at 252. See, also, *Layman v. Bins* (1988), 35 Ohio St. 3d 176, syllabus. If the property is inspected, any misrepresentations or misstatements made by the seller do not preclude the application of the doctrine unless said statements rise to the level of fraud. *Traverse, supra; Layman, supra.* See, also, *Oaks v. Allen* (1964), 7 Ohio App. 2d 72, 76.

In this case, Frost was fully aware of the water conditions on Lot 18 and had ample time to inspect the lot without hindrance. In fact, Frost conceded that he purchased the lot due to the marshy and wet condition of the land. While appellant argues that appellee misrepresented Lot 18 as being suitable for residential purposes, he testified that he knew that the water on Lot 18 would present unusual, but not insurmountable, problems in constructing a residence. Further, Frost testified that he does reside in the house constructed on Lot 18 and that he has no water problems, *i.e.*, sufficient drainage from the hill has been provided through drains and the catch basin in the cul-de-sac. Therefore, statements, written or oral, concerning the purpose to which the land could be used did not rise to the level of fraud.

Appellant asserts, however, that the filled-in creek bed was a latent defect and that Bank One had a duty to disclose this hidden defect.

While nondisclosure of a latent defect is an exception to the rule of *caveat emptor,* the exception is limited to instances where the defect is known to the seller and unknown to

the buyer. *Klott v. Associates Real Estate* (1974), 41 Ohio App. 2d 118, 122. Sellers of unimproved lots have no duty to disclose that land has been filled absent a showing that the seller had knowledge of the fill. See *Schmitt v. Long* (Fla. App. 1974), 290 So. 2d 139. See, generally, Annotation, Liability of Vendor of Structure for Failure to Disclose That it Was Built on Filled Ground, 80 A.L.R. 2d (1961, Supp. 1979) 1453. In the instant case, Bank One, as the successor in interest to Klingman, asserted that it had no knowledge of the filled-in creek bed. Appellant offered *no* evidence that Bank One had knowledge of the filled creek bed at the time of the sale. Thus, as to Bank One, the trial court did not err in granting a directed verdict on the issue of nondisclosure.

The question arises as to whether appellee Klingman, as the original owner and developer of River Run, had any duty to disclose the latent defect, *i.e.*, filled creek bed, to appellant at the time of the conveyance of Lot 18. Although Klingman knew of the defect, he had no relationship, by means of agency or otherwise, with appellant which would give rise to a duty to disclose at the time of the real estate transaction. See *Davis v. Cavalear Realty Co.* (Feb. 12, 1988), Lucas App. No. L-87-044, unreported, 4-6 (finding former owners of real property had no duty to disclose a latent defect because they were strangers to the fraud"). For the foregoing reasons, appellant's third assignment of error is found not well-taken.

Appellant's fourth assignment of error relates to alleged damages resulting from flooding on June 17, 1987, flooding which occurred as the result of "vandalism," and for the extra cost of constructing his house in a "marshy" area on a filled-in creek bed. Because we have determined that appellees' conduct as it concerned the sale of Lot 18 and the grading of Lot 17 was not tortious, appellees are not liable to appellant for any damages suffered. We note, however, that appellant failed to produce any evidence of actual damages as a result of the June 17 "flood" or the floods allegedly attributable to "vandalism." Most, if not all, of appellant's claimed damages were incurred as the result of the extra costs involved in erecting a house upon this particular piece of property. As stated previously, appellant knew of the water conditions on his property long before he purchased it and became aware of the filled-in creek bed and the added requirements for the

construction of a foundation before he began construction of a house on that site.[1] It is apparent from a reading of the record that appellant was determined, despite the added cost, to develop this property in only one way and did not consider any alternatives. Appellees cannot be made responsible for "damages" which were not the result of any tortious conduct on their part. See *Adcock v. Rollins Protective Services Co.* (1981), 1 Ohio App. 3d 160, 161; *Thatcher v. Lane Construction Co.* (1970), 21 Ohio App. 2d 41, 48-49. Accordingly, appellant's fourth assignment of error is found not well-taken.

In his fifth assignment of error, Frost argues that the trial court erred in finding that appellant failed to mitigate his damages, if any.

After the June 17, 1987 grading of Lot 17 and "flooding" of appellant's excavation and "trench," Bank One offered to repurchase Lot 18 for the full purchase price, $14,250. Appellant refused. The bank then offered to pay a part of the cost of installing a drainage line from appellant's "trench" out to the street. Subsequently, the bank offered to pay for the total cost of such a line. Appellant refused both offers. Prior to trial appellant filed a motion *in limine* requesting that the trial court preclude any testimony of this "offer to settle." The motion was overruled, renewed at trial, and was overruled on the record.

Appellant asserts that the evidence of appellee Bank One's offer to repurchase Lot 18 and to install a drainage line could not be admitted into evidence, under Evid. R. 408, as proof of appel-lant's failure to mitigate his damages.

Evid. R. 408 provides, in part:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. ***. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

Statements made prior to the existence of a controversy are not covered by the rule. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.* (C.A.10, 1977), 561 F. 2d 1365, 1373. In addition, offers of compromise are admissible for purposes other than proof of the invalidity of a claim, liability under a claim, or the amount of a claim. *South v. Toledo Edison Co.* (1986), 32 Ohio App. 3d 24.

The offers in this case were made before any litigation between the parties or, if the testimony of appellant himself is to be believed, litigation was ever contemplated. In addition, the evidence of the offers was not used to establish the validity of, the liability under, or the amount of appellant's claim. Rather, this evidence was offered to show that appellant failed in his duty to mitigate or minimize his damages. See *Foust v. Valley-brook Realty Co.* (1981), 4 Ohio App. 3d 164, 168. Pursuant to this doctrine, one who is injured by a wrongful act or omission of another has a duty to take reasonable and ordinary efforts to minimize his damages which result from the tortious conduct. *Id.* While appellant was not required to sell Lot 18 back to Bank One, reasonable steps to provide adequate drainage for his property would have minimized any of appellant's asserted damages. Accordingly, the trial court did not err in admitting evidence of the offers made by Bank One to appellant after the June 17 grading of Lot 17. Appellant's fifth assignment of error is found not well-taken.

Appellant offers no argument in support of his final assignment of error which states that the trial court erred in granting a directed verdict to appellees and dismissing this cause. Our review of the record indicates that the rulings of the court below were not in error and that reasonable minds could only conclude that appellant failed to offer any evidence which would permit recovery on any of his legal theories. Accordingly, appellant's sixth assignment of error is found not well-taken.

On consideration whereof, this court finds that substantial justice has been done the party complaining, and the judgment of the Sandusky County Court of Common Pleas is affirmed. Costs of this appeal assessed to appellant.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. See, also, Supp. R. 4, amended 1/1/80.

GLASSER, J., ABOOD, J., concur.

CHARLES D. ABOOD, J., concurs in judgment only.

[black bar]

[1] Appellant's excavation for a retaining wall was flooded on June 17 but appellant testified at trial that he was not asking for any damages related to the construction of the wall.