T.C. Memo 2020-42

UNITED STATES TAX COURT

CHARLES P. LITTLEJOHN AND MAXINE M. LITTLEJOHN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8457-16.                    Filed April 9, 2020.

John D. Faucher, for petitioners.

Kris H. An, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge: By notice of deficiency, respondent determined

deficiencies in petitioners' Federal income tax and section 6662(a) accuracy-

related penalties as follows:[1]

_____

[1]All section references are to the Internal Revenue Code (Code) in effect at
(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2010 | $48,536 | $9,707 |
| 2011 | 47,335 | 9,467 |
| 2012 | 38,476 | 7,695 |
| 2013 | 182,478 | 36,495 |

After concessions, the issues for decision are: (1) whether petitioners are entitled to certain rental real estate deductions for the tax years at issue; (2) whether they are entitled to theft loss deductions for their tax years 2010 and 2013; and (3) whether they are liable for the section 6662(a) accuracy-related penalty for each tax year at issue.

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein by this reference. Petitioners, husband and wife, resided in California when they filed their petition. Charles P. Littlejohn has a law degree and previously taught law at the Southern California Institute of Law in Santa Barbara.

---

[1](...continued)
all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All monetary amounts are rounded to the nearest dollar.

**[*3]** <u>Rental Properties</u>

During the tax years at issue, Maxine M. Littlejohn owned two rental properties in Lompoc, California. One of the properties, located on L Street (L Street property), was a triplex. The other, located on Oak Hill Drive (Oak Hill property), was a single-family home that Mrs. Littlejohn's son had purchased in 1996 for $234,500. In 2005 he put Mrs. Littlejohn on the deed as a partial owner, and in 2010 he quitclaimed his entire interest in the Oak Hill property to her.

Mr. Littlejohn managed these rental properties. His responsibilities included making minor repairs, gardening, coordinating with service persons, and collecting rent.

<u>Prefumo Canyon Road Property</u>

Before Mrs. Littlejohn acquired the property, John Stanier and Kimberly Stanier (Staniers), through the John and Kimberly Stanier Family Trust (Stanier Family Trust), owned a 4,862-square-foot house on 85.5 acres off Prefumo Canyon Road in San Luis Obispo, California (Prefumo property). This four-story house in the style of a French chateau has six bathrooms, a pool, a spa, a wine cellar, a slate roof, and extensive landscaping. The house is built into a hillside, and the roof of the detached four-car garage, which is tiled with travertine marble, is level with the backyard and serves as a sundeck.

**[*4]**   In October 2004, in connection with the Staniers' refinancing of the Prefumo property, their bank obtained an appraisal which valued the Prefumo property at $3,600,000.

On January 3, 2006, the Staniers hired Linda Wilson, a licensed realtor in San Luis Obispo, to sell the Prefumo property.  Before selling the Prefumo property the Staniers paid a contractor, Phillip King, $1,800 to repair a drain on the garage roof/sundeck.

After seeing an advertisement for the Prefumo property and after visiting it in late February 2006, petitioners decided that Mrs. Littlejohn would buy it as her separate property.  Mrs. Littlejohn hired as her realtor Ms. Wilson, who also represented the Staniers.  On or about March 30, 2006, Mrs. Littlejohn signed a residential purchase agreement and joint escrow instruction offering to purchase the Prefumo property "as is" for $2,500,000.  Mr. Littlejohn was not a party to the sale.

On April 6, 2006, the well pump was tested on the property.  The pump test report, which both Mrs. Littlejohn and the Staniers initialed, indicated a consistent flow of five gallons per minute.

On April 20, 2006, Mrs. Littlejohn signed the real estate transfer disclosure statement prepared by the Staniers and Ms. Wilson.  This document, in response to

**[*5]** the question: "Are you (Seller) aware of any significant defects/malfunctions in any of the following?", indicated that the "garage ceiling has small leak in severe weather (rain)", that the driveway was cracked, and that some windows had defective seals. Ms. Wilson's agent's disclosure statement, which was also part of the real estate transfer disclosure statement, noted, among other things, that there were many fogged windows, worn and stained carpet, stains in the living room ceiling, a crack in the marble near the library entry, and a small crack at the bottom of the pool; it also noted that "garage leak is being repaired during inspection." As part of her disclosure statement Ms. Wilson recommended a professional home inspection.

On April 26, 2006, petitioners hired Andrew Wallace to inspect the Prefumo property. His inspection report listed the "Decks/Balcony" as "marginal", noting that "[d]rainage appears incomplete at 2nd floor walking deck." The report listed the "Roof" as "defective", noting that "[w]ater leaks through garage ceiling; apparently due to failed seal at patio deck drain above." The report listed the "Crawl Space" as "marginal", noting that "[i]nsulation installed between floor joists in under-floor crawlspace is upside-down; vapor barrier should be against sub-floor. In the current condition, moisture may be trapped against the sub-floor in the insulation." In describing the condition of one of the bedrooms, the report

**[*6]** listed the "Ceilings" as "marginal", noting "[s]tains, mild water damage at bedroom ceiling.  Possibly associated with previous roof leaks which have been addressed."  The report listed the windows as "marginal", noting that "[a] number of windows are 'fogged' due to failed seals of dual-glazed units.  Recommend evaluation and replacement as needed by a window contractor."

On April 27, 2006, petitioners hired McElwain Real Estate to appraise the Prefumo property.  The appraisal report valued the Prefumo property at $2,600,000 and described the house as being of "[v]ery good quality construction in good condition".

On May 2, 2006, Mrs. Littlejohn reviewed and signed a seller property questionnaire completed by the Staniers.  In response to the question "ARE YOU (SELLER) AWARE OF . . . Defects in any of the following, (including past defects that have been repaired) * * * roof * * * drainage * * * ceilings floors or appliances",  the box for "Yes" was checked, with the notation that "upper balcony on garage [was] waterproofed and re-sealed Feb '06.  New drain for original garage roof installed Dec '05."  In response to the question "ARE YOU (SELLER) AWARE OF . . . Water intrusion into any part of any physical structure on the Property; leaks from or in any * * * roof; standing water, drainage", the box for

[*7] "Yes" was checked, with the notation that there is "slow drainage in storm conditions at the rear patio area" and that it " usually takes a day to drain".

On or about June 1, 2006, the Staniers and Mrs. Littlejohn closed the escrow for the Prefumo property. The Staniers then rented the house back from petitioners for four to five weeks before petitioners began moving their belongings into the house.

Shortly after moving into the Prefumo property, petitioners had problems with the well-water system: there was sand in the water line, the water supply was insufficient to irrigate the property's landscaping, and tests indicated that there was arsenic in the water.

On November 27, 2006, in conjunction with applying for an increased line of credit, petitioners hired a second appraiser to value the Prefumo property. This appraiser valued the property at $2,900,000.

In December 2007 the ceiling of the Prefumo property garage collapsed. On December 28, 2007, petitioners reported this damage to their insurance company. By letter dated April 3, 2008, the insurance company advised petitioners that the damage was not covered by their insurance policy because the damage resulted from "faulty or negligent construction of the deck and one of the drains on the deck, wear and tear, and rusting or deterioration of the flashing surrounding the

[*8] deck, all of which allowed water to intrude into the interior of the garage." The insurance company noted that "[t]he center drain on the [sun]deck had been replaced and was installed in a faulty manner and ha[d] probably been leaking since it was installed."

At some point Mr. Littlejohn came to believe that the slate roof was improperly attached to the house and that the Staniers had tried to cover up this and a number of other defects. He also came to believe that the water pipes had broken on several occasions before Mrs. Littlejohn had acquired the Prefumo property and that the Staniers had tried to cover up the resulting water damage.

On January 23, 2008, petitioners filed a complaint with the California Contractors State License Board against Mr. King (whom the Staniers had hired to repair the garage-roof/sundeck drain); they also made a claim against his contractor bonding company. On December 22, 2008, the bonding company settled with petitioners for $7,500.

On or about August 5, 2009, Mrs. Littlejohn filed a complaint in the Superior Court of the State of California, County of San Luis Obispo (California superior court), against the Staniers individually and as trustees of the Stanier Family Trust; Ms. Wilson; Ms. Wilson's realty company, Wilson & Co.; and Mr. King. In her complaint Mrs. Littlejohn sought more than $2 million each from

[*9] Ms. Wilson and the Staniers.  Mrs. Littlejohn also sought $150,000 from Mr. King with respect to the garage damage.

Mr. King did not respond to the lawsuit.  On September 22, 2010, after a default hearing, the California superior court awarded Mrs. Littlejohn $150,000 as a default judgment against Mr. King.[2]  The judgment states that Mr. King "was a willing member of a conspiracy [with the Staniers, the Stanier Family Trust, and Ms. Wilson and her real estate company] to defraud a future buyer of the * * * [Prefumo property] by engaging in a fraud involving an omission and/or cover-up of material defects of the garage and travertine deck".

On October 18, 2013, Mrs. Littlejohn settled with Ms. Wilson for $150,000 and with the Staniers for $50,000.  The settlement agreement states that these settlement payments released and fully discharged the Staniers and Ms. Wilson from any claim as set forth in the filed complaint or in any way connected with Mrs. Littlejohn's purchase of the Prefumo property.  On November 27, 2013, the California superior court dismissed Mrs. Littlejohn's complaint.

---

[2]The judgment states that "total recoverable damages related to the fraud and conspiracy to defraud as to the garage and deck coverup, coupled with actual damages to personal possessions and loss of use and enjoyment are $266,000." The judgment goes on to state that because Mrs. Littlejohn's complaint specifically sought only $150,000, the default judgment was limited to that amount.

[*10] Income Tax Return Preparation

Petitioners timely filed joint Federal income tax returns for each tax year at issue.[3]  On August 20, 2013, they filed Form 1040X, Amended U.S. Individual Income Tax Return, for tax year 2010.[4]  They employed Frank Kloster as their tax return preparer.  Mr. Kloster is a certified public accountant and a licensed attorney who specializes in tax matters.  He has been in private practice since 1986.  Mr. Littlejohn has been his client for more than 15 years.

For the tax years at issue, Mr. Kloster prepared petitioners' income tax returns using worksheets that Mr. Littlejohn provided to him.  Mr. Kloster was not provided the underlying documents relating to the expenses listed on these worksheets, and he did not independently verify these numbers.

On their Schedules E, Supplemental Income and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.), of their returns for the tax years at issue, petitioners reported deductions for rental expenses and repairs relating to the Oak Hill property and the L Street property.  In connection with the L Street property their deductions included repair expense

[3]On their Form 1040, U.S. Individual Income Tax Return, for tax year 2013 petitioners reported zero tax liability and claimed a $160,243 refund.

[4]On this amended return petitioners reported $73,053 of tax liability and claimed a $35,440 refund.

[*11] deductions of $3,354, $4,124, $898, and $4,468 for tax years 2010, 2011,

2012, and 2013, respectively.

In connection with the Oak Hill property, on their Schedules E petitioners

claimed deductions for expenses as follows:

|  | Taxable years | | | |
| --- | --- | --- | --- | --- |
| Expense | 2010 | 2011 | 2012 | 2013 |
| Cleaning & maintenance | $1,800 | $4,250 | $2,928 | $2,642 |
| Insurance | 2,009 | 1,121 | 1,180 | 1,244 |
| Mortgage interest | 15,756 | 14,000 | 13,264 | 12,491 |
| Repairs | 5,870 | 2,188 | 793 | 952 |
| Supplies | --- | --- | 749 | --- |
| Taxes | 3,627 | 3,683 | 6,084 | 6,339 |
| Utilities | 2,811 | 3,228 | 3,314 | 5,229 |
| Other--amortization | 86 | 86 | 86 | 86 |
| Other--pest control | --- | --- | 3,198 | --- |
| Depreciation[1] | 23,094 | 20,323 | 20,019 | 21,200 |
| Total | 55,053 | 48,879 | 51,615 | 50,183 |

[1]The depreciation deductions were based on an unadjusted basis in the Oak Hill property of $542,039. Petitioners elected to depreciate the property straight-line over 27.5 years.

On Schedule A, Itemized Deductions, of their 2010 Form 1040X, petitioners

reported a casualty or theft loss of $101,256. The associated Form 4684,

[*12] Casualties and Thefts, describes the claimed loss as a "fraud loss" attributable to the "non recoverable" judgment against Mr. King. This Form 4864 shows the "Cost or other basis" of the subject property as $150,000. It shows the "Fair market value **before** casualty or theft" as $255,000[5] and shows the "Fair market value **after** casualty or theft" as zero, indicating a $255,000 decrease in fair market value. Because $150,000 is less than $255,000, pursuant to the instructions on the form petitioners reported $150,000 as the casualty or theft loss, reduced to $101,256 after application of the section 165(h)(2) limitation.[6]

On Schedule A of their 2013 income tax return, petitioners also reported a casualty or theft loss with respect to the Prefumo property, described on the associated Form 4684 as a "FRAUD/CASUALTY LOSS". The Form 4684 shows the cost or other basis of the subject property as $1,196,000.[7] The Form 4684 shows the fair market value of the property before the casualty or theft as

---

[5]The record does not reveal the source of this number.

[6]Under the general rule of sec. 165(h)(2) a net casualty loss is allowed only to the extent it exceeds 10% of adjusted gross income.

[7]According to worksheets that petitioners provided to Mr. Kloster for use in preparing their return, $1,196,000 represents the sum of "2010 loss" of $150,000, attorney's fees paid of $405,000, expert witness' fees paid of $60,000, downpayment lost of $250,000, refinancing fees of $20,000, repairs of $800,000, court costs of $1,100, and moving expenses of $10,000, less the $200,000 total settlement proceeds received in December 2013 from the Staniers and Ms. Wilson.

**[*13]** $1,196,000 and shows the fair market value of the property after the casualty or theft as zero. On this basis petitioners reported a casualty or theft loss of $1,196,00, reduced to $1,143,792 after application of the section 165(h)(2) limitation.

By notice of deficiency respondent denied for lack of substantiation deductions for all of petitioners' reported repair expenses for the L Street property[8] (but allowed all the other claimed Schedule E expense deductions) and denied all of petitioners' rental expense deductions for the Oak Hill property.[9] Respondent also denied petitioners' claimed casualty/theft loss deductions for tax years 2010 and 2013 on the ground that they had not established that any casualty or theft had occurred or that any loss had been sustained. Respondent also determined that for each of the tax years at issue petitioners were liable for an accuracy-related penalty under section 6662(a) as a result of one or more of: (1) negligence or disregard of rules or regulations; (2) a substantial understatement of income tax; (3) a

---

[8]With respect to the L Street property, respondent's notice of deficiency disallowed repair expense deductions of $1,691 for tax year 2011 even though petitioners had claimed only $898. Respondent concedes the $793 difference.

[9]In this proceeding respondent has conceded deductions for various amounts of Schedule E expenses for the Oak Hill property as discussed in more detail infra.

**[*14]** substantial valuation overstatement; or (4) a transaction lacking economic substance.[10]

## OPINION

### I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer generally bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners have not claimed and the record does not establish that the conditions of section 7491(a) have been met to shift the burden of proof to respondent with regard to any factual issue.

### II. Schedule E Deductions

Section 162 allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. In addition, section 212(2) allows a deduction for ordinary and necessary expenses paid or incurred for the management, conservation, or maintenance of property held for the production of income. See Grant v.

---

[10]On January 4, 2016, the revenue agent's manager signed a Civil Penalty Approval Form prepared by the agent and proposing to impose on petitioners for each tax year at issue an accuracy-related penalty for negligence and a substantial understatement of income tax, pursuant to sec. 6662(a) and (b)(1) and (2).

[*15] Commissioner, 84 T.C. 809, 825 (1985), aff'd without published opinion, 800 F.2d 260 (4th Cir. 1986); see also sec. 1.212-1(h), Income Tax Regs. The taxpayer bears the burden of proving entitlement to any claimed deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). This burden requires the taxpayer to substantiate deductions by keeping and producing adequate records. Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965); sec. 1.6001-1(a), (e), Income Tax Regs.

If a taxpayer's records are lost or destroyed through circumstances beyond his or her control, the taxpayer may substantiate deductions through reasonable reconstruction. See Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979). The burden is on the taxpayer to show that the documentation was actually lost or destroyed because of circumstances beyond his or her control. See Adler v. Commissioner, T.C. Memo. 2010-47, aff'd, 443 F. App'x 736 (3d Cir. 2011).

If a taxpayer establishes that a deductible expense has been paid but is unable to substantiate the precise amount, we generally may estimate the amount of the deductible expense, bearing heavily against the taxpayer responsible for the inexactitude. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). We

**[\*16]** cannot estimate deductible expenses, however, unless the taxpayer presents evidence providing a sufficient basis for making an estimate.  Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

### A.  L Street Property Schedule E Expenses

In connection with the L Street property, respondent concedes that petitioners have substantiated and may deduct repair expenses of $460, $322, $652, and $610 for tax years 2010, 2011, 2012, and 2013, respectively, for their payments to an appliance store (excluding a $986 payment for a new refrigerator). Without meaningful analysis, petitioners contend on brief that they are entitled to deduct greater repair expenses than respondent has conceded for three of the four tax years at issue; they claim total repair expense deductions of $5,447, $2,955, and $832 for tax years 2010, 2011, and 2013, respectively.  For the most part we are unable to correlate these claims with the evidence presented.

On the basis of all the evidence in the record, we hold that petitioners have substantiated repair expenses of $1,106 for tax year 2010, $1,664 for tax year 2011, $652 for tax year 2012, and $832 for tax year 2013.[11]

---

[11]We have determined these amounts on the basis of documented payments to Farm Supply Co. (Farm Supply) (which Mr. Littlejohn credibly testified were for irrigation supplies at the L Street property) and Medina Sewer (which Mr. Littlejohn credibly testified were for plumbing services), which we have added to

(continued...)

[*17] B. <u>Oak Hill Property</u>

In connection with the Oak Hill property respondent concedes that petitioners have substantiated and may deduct $34,461, $31,822, $35,909, and $31,245 for tax years 2010, 2011, 2012, and 2013, respectively, for expenses incurred for maintenance, insurance, mortgage interest, taxes, utilities, and depreciation. The amounts remaining in dispute are for maintenance expenses, repair expenses, and depreciation.

### 1. <u>Maintenance Expenses</u>

In connection with the Oak Hill property, respondent concedes that petitioners are entitled to deduct maintenance expenses of $2,400 for each tax year at issue to account for payments made to their gardener.[12] Petitioners dispute the

---

[11](...continued)
the amounts respondent has conceded. Respondent contends that certain of petitioners' other reported "repair" expenses (for water utilities, gardening, and business taxes paid) duplicate expenses for which deductions have already been allowed in other expense categories. Petitioners have not clearly disputed this contention and have offered no evidence to refute it. Consequently, we have disallowed any deduction for those amounts and have also disallowed any deduction for a $1,500 payment which the evidence indicates was for a new furnace purchased in 2010 (a capital expenditure rather than a repair) as well as various other items included in petitioners' documentation as to which the business purpose of the payments has been inadequately substantiated.

[12]Respondent represents that the amount of this concession is based on "one monthly check for a gardener and extended to all the years at issue." We observe

(continued...)

**[*18]** adequacy of these concessions as related to two of the four tax years at issue; they claim that they have substantiated maintenance expenses of $3,305 and $2,791 for tax years 2011 and 2013, respectively.[13]

On the basis of our review of all the evidence, we are satisfied that petitioners have substantiated gardening expenses (in addition to the amounts conceded by respondent) of $688 for tax year 2011 and $292 for tax year 2013.[14] Consequently, we hold that with respect to the Oak Hill property petitioners are entitled to deduct Schedule E maintenance expenses (including the amounts respondent has conceded) of $2,400, $3,088, $2,400, and $2,692 for tax years 2010, 2011, 2012, and 2013, respectively.

---

[12](...continued)
that the parties agree that petitioners are entitled to deduct $2,400 of maintenance expenses for tax year 2010 even though on their 2010 Schedule E they claimed only $1,800.

[13]We are unable to correlate these amounts with the amounts reported on petitioners' Schedules E.

[14]Petitioners have failed to adequately substantiate the business purpose of other items included in their documentation and have also failed to establish that they are entitled to deduct certain payments made to a vendor as to which Mr. Littlejohn testified only that the vendor had sold him a commercial wood chipper.

[*19]      2. Repair Expenses

In connection with the Oak Hill property respondent has disallowed all repair expense deductions. Petitioners contend that they have substantiated repair expenses of $3,964, $14,402, $3,814, and $2,788 for tax years 2010, 2011, 2012, and 2013, respectively.[15] Some of the reported expenses ($1,216, $2,398, and $626 for tax years 2010, 2011, and 2013, respectively) are for amounts paid to Farm Supply for landscaping materials. Respondent questions whether these expenses actually relate to the Oak Hill property rather than to some other property. On the basis of Mr. Littlejohn's testimony, we are satisfied that these Farm Supply expenditures relate to the Oak Hill property. Respondent also contends that many of these expenses are double-counted in petitioners' documentary evidence. On this point we agree with respondent. Although we are unable to correlate all the various items in the voluminous materials petitioners have provided, it is apparent that in many instances petitioners have reported amounts shown on Farm Supply invoices while also reporting those same amounts as included in checks written to Farm Supply. Bearing heavily against petitioners, who have created this evidentiary quagmire, we conclude that they have

---

[15]We are unable to correlate these amounts with the amounts reported on petitioners' Schedules E.

[*20] substantiated one-half of the total amounts that they report as payments to Farm Supply; i.e., $608, $1,199, and $313 for tax years 2010, 2011, and 2013, respectively.

For similar reasons involving double-counting of invoiced amounts, we conclude that for tax year 2012 petitioners have substantiated one-half the amounts reported as payments to Western Exterminator (excluding the largest items of $900 and $1,550 for which no invoices were submitted), resulting in an allowable repair expense deduction of $466 for tax year 2012.

The other items reflected in petitioners' voluminous documentation have been inadequately substantiated. The evidence does not adequately distinguish ostensibly personal expenses, such as for toilet paper, from the purported Schedule E expenses petitioners seek to substantiate. Mr. Littlejohn's trial testimony, which touched briefly upon only a few of the many items reported as expenses, was too vague and general to overcome these infirmities.

Mr. Littlejohn testified that he once had receipts to substantiate all of petitioners' reported expenses for their rental properties but that some of the receipts went missing after a prior representative assisting in the tax audit mixed them up with other documents and could not sort them out afterward. On the basis of this testimony, petitioners suggest that we should allow them all their claimed

[*21] rental property expense deductions. Considering the volume of documentation that petitioners have offered in an attempt to substantiate their reported rental property expenses, and the inadequacy of much of that documentation, we are unpersuaded by these contentions. In any event, petitioners have not provided a sufficient evidentiary basis for estimating allowable expenses associated with any missing documentation. See Vanicek v. Commissioner, 85 T.C. at 742-743.

In sum, we hold that with respect to the Oak Hill property, petitioners are entitled to deduct Schedule E repair expenses of $608, $1,199, $466, and $313 for tax years 2010, 2011, 2012, and 2013, respectively.

### 3. Depreciation

Section 167 permits as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. This depreciation deduction is determined by reference to the adjusted basis of the property, the applicable depreciation method, the applicable recovery period, and the applicable convention. Secs. 167(c)(1), 168; Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21, 45 (1997). In order to prove entitlement to a depreciation deduction, a taxpayer must establish the property's depreciable basis by showing the cost of the property, its useful life or recovery

[*22] period, and the previously allowable depreciation.  E.g., Cluck v.

Commissioner, 105 T.C. 324, 337 (1995).

Respondent concedes that, in connection with the Oak Hill property,

petitioners are entitled to a depreciation deduction of $8,527 for each tax year at

issue.[16]  Petitioners claim that their depreciation deduction should be $21,818 for

each tax year at issue.[17]  Although their income tax returns report a basis in the

Oak Hill property of $542,039, in this proceeding petitioners claim that the

property's adjusted basis was "at least $600,000".  This claim is based on Mr.

Littlejohn's vague and general testimony that "a rough estimate of repairs and

upgrades to that house was approximately $600,000".  Although Mr. Littlejohn's

testimony described a number of improvements and repairs that petitioners made

to the property, he made no attempt to quantify the costs of specific improvements

or to distinguish any such improvements from repairs.  Petitioners offered into

---

[16]Respondent accepts petitioners' election to depreciate the property straight-line over 27.5 years.  For purposes of his concession, respondent treats Mrs. Littlejohn's adjusted cost basis in the Oak Hill property as $234,500--the amount that Mrs. Littlejohn's son paid for the Oak Hill property in 1996. Respondent asserts that by allocating the entire purchase price to the depreciable basis of the house and allocating nothing to the land, his concession makes allowance for any possible improvements to the house.  We have no occasion to give further consideration to the premises of respondent's concession.

[17]Oddly, this amount is less than petitioners deducted on their Schedule E for tax year 2010 but more than they deducted for tax years 2011, 2012, and 2013.

[*23] evidence a sheaf of documents to substantiate expenditures for various claimed improvements, but the expenditures reflected in those documents add up to only $127,263.[18]

Petitioners contend that they are unable to produce all their receipts for the improvements to the Oak Hill property because, they say, most of their records, which had been stored on shelves in the Prefumo property garage, were destroyed when the garage roof collapsed in December 2007. Consequently, petitioners assert, on the basis of Mr. Littlejohn's testimony we should find that the cost of the improvements was at least $600,000. We are unpersuaded.

Notwithstanding petitioners' claims about the destruction of their records, as noted they have in fact produced a great many documents in an effort to substantiate the cost of certain improvements and repairs to the Oak Hill property. These documents purport to substantiate a great many expenditures over a period stretching from January 1, 1997, to March 8, 2007. These documents obviously were not destroyed by the garage roof's collapse in December 2007. Petitioners have not explained the selective availability of these documents or even exactly

[18]On brief petitioners claim that the expenditures substantiated in these documents total $139,844, as shown on a schedule attached to their brief. It appears, however, that this $139,844 improperly includes two items, totaling $12,581, that were crossed off the schedule attached to the associated exhibit as included in the parties' joint first supplemental stipulation of facts.

[*24] what documents they contend are missing from this period. Nor have they explained the absence of records for expenditures after December 2007, when the garage roof collapsed.

In any event, petitioners have offered no reasonable grounds for substantiating their basis in the Oak Hill property through reconstruction. In particular, Mr. Littlejohn's vague and general testimony that there were "at least" $600,000 of improvements is inadequate to substantiate any particular amount as their basis.[19]

In short, petitioners have failed to establish that their depreciable basis in the Oak Hill property is greater than the $234,500 that respondent has conceded. Consequently, giving effect to respondent's concession, we hold that with respect to the Oak Hill property petitioners are entitled to a depreciation deduction of $8,527 for each tax year at issue.

---

[19]As noted, Mrs. Littlejohn's son bought the Oak Hill property in 1996, put her on the deed as a partial owner in 2005, and quitclaimed his entire interest to her in 2010. Petitioners have not addressed the effect of these ownership changes upon the proper determination of their adjusted basis in the property.

[*25] III. Theft Losses

Section 165(a) permits a deduction against ordinary income for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." In the case of a loss by theft, a taxpayer may deduct the lesser of: (1) the fair market value of the stolen property; or (2) the adjusted basis as determined under section 1011. Sec. 165(b); secs. 1.165-7(b)(1), 1.165-8(c), Income Tax Regs.

A theft loss is "sustained during the taxable year in which the taxpayer discovers such loss." Sec. 165(e). If there exists a claim for reimbursement in the year of discovery, however, no loss shall be considered sustained until the taxable year in which it can be ascertained with reasonable certainty that no reimbursement will be received. Sec. 1.165-1(d)(3), Income Tax Regs. Whether a reasonable prospect of recovery exists is a question of fact to be determined upon an examination of all facts and circumstances. Sec. 1.165-1(d)(2)(i), Income Tax Regs. "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975). The determination as to whether there is a reasonable prospect of

**[\*26]** recovery is based primarily on objective factors; the taxpayer's subjective belief may also be considered, but it is not the sole or controlling criterion. Id.; see Jeppsen v. Commissioner, 128 F.3d 1410, 1418 (10th Cir. 1997), aff'g T.C. Memo. 1995-342.

As used in section 165, the term "theft" is a word of general and broad connotation, intended to cover any criminal appropriation of another's property, including theft by larceny, embezzlement, obtaining money by false pretenses, and any other form of guile. Bellis v. Commissioner, 61 T.C. 354, 357, aff'd, 540 F.2d 448 (9th Cir. 1976); see sec. 1.165-8(d), Income Tax Regs. Generally, whether a theft loss has been sustained depends upon the law of the State where the loss was purportedly sustained. See Norton v. Commissioner, 333 F.2d 1005, 1008 (9th Cir. 1964), aff'g 40 T.C. 500 (1963).

Petitioners bear the burden of proving by a preponderance of the evidence that a theft actually occurred. See Rule 142(a); Jones v. Commissioner, 24 T.C. 525, 527 (1955). To carry this burden of proof, petitioners must establish the existence of a theft within the meaning of section 165, the amount of the claimed theft loss, and the year in which the theft loss was discovered. See Elliott v. Commissioner, 40 T.C. 304 (1963); River City Ranches No. 1 Ltd. v.

[*27] Commissioner, T.C. Memo. 2003-150, aff'd in part, rev'd in part on other grounds, 401 F.3d 1136 (9th Cir. 2005).

Petitioners' alleged loss occurred in the State of California. Cal. Penal Code sec. 484(a) (Deering 2000) provides:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, * * * or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property * * * is guilty of theft. * * *

Under this statute, to prove a theft requires evidence that property was stolen by larceny, false pretenses, or embezzlement. People v. Gonzales, 392 P.3d 437, 442 (Cal. 2017). Inasmuch as petitioners allege theft through fraudulent misrepresentations, they allege theft by false pretenses, which requires the following elements: "(1) the * * * [perpetrator] made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the * * * [perpetrator] in reliance on that representation." People v. Williams, 305 P.3d 1241, 1248 (Cal. 2013) (quoting People v. Wooten, 52 Cal. Rptr. 2d 765, 770 (Ct. App. 1996)). Implicit in these elements is a relationship of privity between perpetrator and victim. Elec. Picture Sols., Inc. v. Commissioner, T.C. Memo. 2008-212; Crowell v. Commissioner, T.C. Memo. 1986-314.

[*28] Petitioners claim that they are entitled to theft loss deductions because they were defrauded in the purchase of the Prefumo property.[20] They claim that the Staniers, Ms. Wilson, and Mr. King conspired to defraud them by intentionally deceiving them about defects in the Prefumo property in order to induce them to purchase it for more than it was worth. They claim to have discovered the fraud in 2008, but on their income tax returns they reported portions of the claimed loss for two different years:[21] (1) on their amended 2010 income tax return they reported a $150,000 theft or casualty loss on the theory that their reasonable prospects of recovery with respect to that much of the theft loss ended in tax year 2010, when they were awarded the $150,000 default judgment against Mr. King, which they say was noncollectible; and (2) on their 2013 income tax return they reported $1,196,000 as a theft or casualty loss for tax year 2013, the year in which Mrs.

---

[20]In their petition and throughout their briefs petitioners assert that they both were defrauded in the sale of the Prefumo property, even though Mr. Littlejohn was not a party to the sale. Because we disallow petitioners' claimed theft loss deductions for other reasons, we give no further consideration to this issue, except insofar as it is relevant to our evaluation of certain evidence, as discussed infra.

[21]Petitioners have not cited, and we have not found, any authority for bifurcating a theft loss in this manner. Since we hold for respondent on other grounds, we do not consider this issue further.

**[\*29]** Littlejohn entered into a settlement with the Staniers and Ms. Wilson.[22] We address each of petitioners' reported, alleged theft losses separately below.

A.  The Reported 2010 Theft Loss

On their amended 2010 income tax return petitioners reported a $150,000 theft loss, characterizing it as a "fraud loss" attributable to the "non recoverable" judgment against Mr. King.[23]  On brief, however, petitioners assert, without meaningful analysis, that they are entitled to a $266,000 theft loss deduction for tax year 2010.  In support of this claim they point to the statement in the California superior court's default judgment that "total recoverable damages related to the fraud and conspiracy to defraud as to the garage and deck coverup, coupled with actual damages to personal possessions and loss of use and enjoyment are $266,000."[24]

---

[22]Although petitioners reported these losses on their tax returns as theft or casualty losses, in this proceeding petitioners argue only that they are entitled to deductions for theft losses.  We deem them to have waived or conceded any argument that they are entitled to deductions for casualty losses with respect to these amounts.  In any event, petitioners have failed to prove the occurrence of a casualty within the meaning of sec. 165 or the amount of any casualty loss.

[23]Similarly on brief petitioners state that the $150,000 theft loss that they reported on their amended 2010 income tax return "represents the amount of the judgment against Phillip King that was never recovered."

[24]As noted, the judgment stated that because Mrs. Littlejohn's complaint

(continued...)

[*30] We are left in doubt about the exact theory of petitioners' alleged 2010 theft loss. Insofar as it is based (as stated on their amended 2010 income tax return) on the $150,000 supposedly "non recoverable" judgment against Mr. King, their claim for a theft loss deduction in that amount must fail.[25] For one thing, they have not shown that they had no reasonable prospect for its recovery at the end of tax year 2010.[26] For that matter, the record does not even definitively establish that the default judgment was never paid. But more fundamentally, even if we were to assume for the sake of argument that the default judgment was never paid,

---

[24](...continued)
specifically sought only $150,000, the default judgment was limited to that amount.

[25]Petitioners have not expressly claimed a bad-debt deduction with respect to Mr. King's purported nonpayment of the default judgment, nor does the record suggest that any such claim would be meritorious. If a nonbusiness bad debt meets the requirements of sec. 166(d), the taxpayer may be entitled to a short-term capital loss deduction (rather than a deduction from income), provided the taxpayer meets various requirements, including the requirement that the debt be one in which the taxpayer has a basis pursuant to sec. 166(b). See, e.g., Swenson v. Commissioner, 43 T.C. 897, 898 (1965) (holding that taxpayer was not entitled to bad-debt deduction because of ex-spouse's failure to pay court-ordered child support). Petitioners have not shown that they had any basis in the default judgment against Mr. King.

[26]The only evidence in this regard is the hearsay testimony of petitioners' income tax return preparer, who testified that Mr. Littlejohn told him in 2013 that the judgment against Mr. King had been determined to be uncollectible. This testimony does not establish that the judgment against Mr. King was in fact uncollectible at the end of 2010.

[*31] mere failure to pay a civil judgment does not constitute a crime of theft. See People v. Ashley, 267 P.2d 271, 282 (Cal. 1954).

Similarly, insofar as petitioners mean to claim a $266,000 theft loss deduction for tax year 2010 on the basis of Mr. King's actions upon which the default judgment is predicated, they have not shown, or even clearly asserted, that Mr. King's actions satisfy any of the elements of theft by false pretenses under California State law. More particularly, they have not shown, or even clearly asserted, that Mr. King made any false representation to them with the intent to defraud them of property or that they transferred any property to Mr. King in reliance on any such representation. See Williams, 305 P.3d at 1248.

Petitioners place great reliance on the statement in the California superior court's default judgment that Mr. King was "a willing member of a conspiracy [with the Staniers, the Stanier Family Trust, and Ms. Wilson and her real estate company] to defraud a future buyer of the * * * [Prefumo property] by engaging in a fraud involving an omission and/or cover-up of material defects of the garage and travertine deck". The default judgment against Mr. King in the civil action, however, and the findings therein, are not probative evidence of a crime. See People v. Beevers, 33 P. 844, 846 (Cal. 1893) (holding that a default judgment in a civil divorce action, including findings of fact and other recitals contained therein,

**[\*32]** was inadmissible as evidence in a related criminal prosecution); People v. Lichtenstein, 135 P. 692, 702-703 (Cal. Ct. App. 1913) (holding that a civil verdict in a divorce action had "no probative value" in a related criminal matter); see also United States v. Satuloff Bros., Inc., 79 F.2d 846, 848 (2d Cir. 1935) ("Judgments and decrees rendered in civil suits are inadmissible in evidence in criminal prosecutions as proofs of any facts determined by such judgments or decrees, and the reason for the rule as stated has been that the parties are different and the quantum of proof required in one case is different from that required in another."); 87 A.L.R. 1258 (originally published in 1933).

Similarly, the finding in the default judgment as to $266,000 of "total recoverable damages" has little if any probative weight in this proceeding. Insofar as petitioners mean to invoke the principle of collateral estoppel, that principle is inapplicable because, if for no other reason, respondent was not a party to the prior litigation. See, e.g., Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), aff'd, 904 F.2d 525 (9th Cir. 1990).

Inasmuch as petitioners' claim for a theft loss deduction for tax year 2010 might be thought to be predicated not specifically on Mr. King's actions but on the actions of others, such as the Staniers and Ms. Wilson, petitioners have failed to show (and have not even asserted) that they had no reasonable prospect of

[*33] recovery against those other persons at the end of tax year 2010, as Mrs. Littlejohn's lawsuit against them was still pending at that time. But more fundamentally, as discussed below, they have failed to show that the actions of the Staniers or Ms. Wilson constituted the crime of theft under California State law.

For these reasons, we sustain respondent's disallowance of petitioners' claimed theft loss deduction for tax year 2010.

B. The Reported 2013 Theft Loss

On their 2013 income tax return petitioners claimed a $1,196,000 deduction as a theft loss. On brief they claim that they are entitled to a $1,775,000 theft loss deduction for tax year 2013, on the theory that purported fraudulent misrepresentations by the Staniers and Ms. Wilson about the property and their failure to disclose "major problems" induced Mrs. Littlejohn to overpay for the Prefumo property by $1,775,000.

As described in Mr. Littlejohn's testimony, the "major problems" with the Prefumo property, which petitioners say they discovered after Mrs. Littlejohn purchased it, included a leak in the garage roof and various other defects in the main house, particularly with respect to the slate roof, previous water or flood damage, defective windows, and a defective well-water system. Petitioners allege that the Staniers and Ms. Wilson gave them no notice of these problems but tried

**[\*34]** to cover them up.  Petitioners suggest that these actions constituted the making of a "false or fraudulent representation or pretense" within the meaning of Cal. Penal Code sec. 484(a), giving rise to a theft loss deduction under section 165(e).

Petitioners have not cited, nor have we found, any case holding there to be a crime of theft pursuant to Cal. Penal Code sec. 484(a) based on an alleged failure to disclose defects in the course of a commercial real estate transaction.  Nor have petitioners cited any case, from this Court or any other, allowing a theft loss deduction in such circumstances.  The few cases in which this Court has allowed theft loss deductions involving real estate transactions have involved contractors who took money from taxpayers under false pretenses and then either absconded or ceased construction and used the money for purposes not related to the construction agreement.  See, e.g., Norton v. Commissioner, 40 T.C. 500; Miller v. Commissioner, 19 T.C. 1046 (1953); Urtis v. Commissioner, T.C. Memo. 2013-66; Hartley v. Commissioner, T.C. Memo. 1977-317.  This is not such a case.

Under California State law, to establish a crime of theft by false pretenses, the perpetrator's intent "must be proved * * * by something more than mere proof of nonperformance or actual falsity".  Ashley, 267 P.2d at 282.  To prove that the perpetrator obtained property by false pretenses, it must be shown that any

[*35] misrepresentations were made "knowingly and designedly". Cal. Penal Code sec. 484(a). The requirement to prove fraudulent intent prevents "[o]rdinary commercial defaults" from becoming "the subject of criminal prosecution". People v. Hartley, 203 Cal. Rptr. 3d 770, 776 (Ct. App. 2016) (quoting Ashley, 267 P.2d at 283); see Norton v. Commissioner, 40 T.C. at 504 (holding that the taxpayer failed to prove a theft loss under California State law even though the representation in question was false, because it was not shown to have been "knowingly and designedly" made).

Petitioners have not shown that the Staniers or Ms. Wilson made misrepresentations, either affirmatively or impliedly by failure to disclose known defects, knowingly and designedly with intent to deceive. The record shows that during the course of negotiations for the Prefumo property the Staniers and Ms. Wilson did in fact give petitioners notice about the types of problems which they cite in support of their theft loss claim. For instance, the real estate transfer disclosure statement, under the section for "significant defects/malfunctions", noted that the garage ceiling leaked and that some windows had defective seals. Similarly, the seller property questionnaire completed by the Staniers indicated problems with leaks in the garage roof and drainage at the patio. In addition, Ms. Wilson's agent's disclosure statement noted, among other things, fogged windows,

[*36] stained carpet, stains in the living room ceiling, and a crack in the marble inside the main house. Her report recommended a professional home inspection, which petitioners procured from Mr. Wallace. That inspection report also listed the roof as defective and pointed to leakage and drainage problems, as well as "marginal windows", which Mr. Wallace recommended replacing. The fact that petitioners' own home inspection report, which Ms. Wilson had recommended they obtain, found defects consistent with those disclosed by the Staniers and Ms. Wilson, undercuts any contention that the Staniers and Ms. Wilson failed to disclose known defects knowingly and designedly with intent to deceive.

The pump test report provided by the Staniers and initialed by Mrs. Littlejohn indicated a flow of five gallons per minute for the water well. Petitioners assert that this was a fraudulent misrepresentation. Mr. Littlejohn testified that during the negotiations for the Prefumo property, Ms. Wilson had shown him a multiple listing report that indicated a well flow of 12 gallons a minute. Petitioners did not offer any such report into evidence, however, and did not call Ms. Wilson as a witness. Mr. Littlejohn's vague and uncorroborated testimony in this regard does not establish that the Staniers or Ms. Wilson misrepresented the well flow or, even if they did, that they did so with fraudulent intent.

**[*37]** Petitioners also contend that the Staniers and Ms. Wilson failed to disclose damage to the house from flooding. In support of this claim petitioners offered the testimony of an internet installer who had worked on the Prefumo property and had allegedly seen water running down the interior stairs on one occasion. This testimony did not specify the year in which this incident occurred, and the record does not indicate who owned the Prefumo property at the time. Moreover, the evidence does not establish that any such flooding caused lasting damage to the house.

Petitioners claim that there were other undisclosed structural defects and other problems with the house, such as an improperly attached roof, but they have provided no concrete evidence that these other defects existed at the time of the sale or, if they did, that the Staniers or Ms. Wilson knew about them. Even if there were such undisclosed structural defects, however, proof of a theft by false pretenses requires proof that any misrepresentation in this regard was knowingly and designedly made with the intent to defraud.

Seeking to establish intent to defraud, petitioners rely heavily on the 2010 default judgment against Mr. King rendered by the California superior court. As previously discussed, the default judgment against Mr. King and the findings therein are not probative evidence as to any crime involving fraud, much less of a

**[\*38]** crime by the Staniers or Ms. Wilson.[27]  Moreover, even if we were to assume

for the sake of argument that this default judgment was evidence of theft by the

Staniers and Ms. Wilson, the default judgment was limited to actions relating to

the purportedly faulty repairs made to the garage roof.  Petitioners have failed to

show that they have not already been reimbursed for any loss relating to the garage

roof, by virtue of the $150,000 default judgment against Mr. King (which, as

---

[27]Mr. King was unavailable as a witness, having failed to comply with petitioners' trial subpoena.  At trial Mr. Littlejohn sought to testify about conversations he allegedly had with Mr. King, in which Mr. King allegedly relayed to Mr. Littlejohn conversations he supposedly had with Ms. Wilson and "Stanier", advising Mr. King to go along with a purported "cover-up" of supposedly faulty repairs made to the garage roof.  In response to respondent's hearsay objection, petitioners invoked the hearsay exception under Fed. R. Evid. 804(b)(3) for a statement against interest by a declarant who is unavailable as a witness.  The Court reserved ruling on the hearsay objection and permitted petitioners to make an offer of proof of Mr. Littlejohn's testimony.  We now sustain respondent's hearsay objection.  The statements attributed to Mr. King were not statements against his interest but rather statements intended to exculpate himself by pointing the finger at Ms. Wilson and the Staniers.  As such, these statements are not admissible under Fed. R. Evid. 804(b)(3).  See Williamson v. United States, 512 U.S. 594, 600 (1994) ("[W]hen part of the confession is actually self-exculpatory, the generalization on which Rule 804(b)(3) is founded becomes even less applicable.  Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.").  Furthermore, petitioners do not represent that Ms. Wilson or the Staniers were unavailable as witnesses (even though they were not called).  Consequently, hearsay included within Mr. King's hearsay testimony, as to the statements supposedly made to him by Ms. Wilson and "Stanier", is likewise inadmissible, inasmuch as none of these statements conforms with an exception to the hearsay rule.  See Fed. R. Evid. 805.

**[\*39]** previously discussed, petitioners have not shown was uncollectible or not collected) and by virtue of the $200,000 settlement proceeds received from the Staniers and Ms. Wilson.

Furthermore, circumstances surrounding the Prefumo property transaction undercut petitioners' claim that the Staniers and Ms. Wilson acted with fraudulent intent. In March 2006 the Staniers agreed to sell the Prefumo property "as is" for $2.5 million.[28] Not too long before that, however, in October 2004 the Staniers' bank had appraised the Prefumo property at $3.6 million. Petitioners have offered no evidence or explanation as to why the Staniers agreed to sell the property for

---

[28]Generally speaking, an "as is" provision "means that the buyer takes the property in the condition visible to or observable by him." Lingsch v. Savage, 29 Cal. Rptr. 201, 209 (Ct. App. 1963). An "as is" provision does not necessarily confer on the seller a general immunity from liability for fraud. Id. Nevertheless, "it is a factor to be considered with all other circumstances in determining whether the buyer has been misled." Driver v. Melone, 90 Cal. Rptr. 98, 102 (Ct. App. 1970). As one California court has stated: "[A]n 'as is' provision in any sale puts potential buyers on notice that the seller makes no warranties about the quality or condition of the thing sold. In practice, it serves as a kind of 'red flag' warning the buyer that the goods or property to be sold may not be in perfect condition or of ideal quality." Shapiro v. Hu, 233 Cal. Rptr. 470, 475 (Ct. App. 1986). The court went on to state that it was aware of "no cases * * * in which a person selling real property 'as is' was liable for defects in the quality or condition of the real property, where the property was not new construction, and the sale was made in good faith and without some form of fraudulent misrepresentation or concealment." Id. at 476.

**[*40]** $1.1 million less than its recently appraised value.[29]  On this record it is no less reasonable to conclude that the Staniers priced the known defects into the "as is" $2.5 million sale price than it is to conclude that they intended to defraud petitioners with respect to any such defects.

Finally, even if petitioners had proved that they were victims of a theft (which they have not), they have failed to establish the amount of any theft loss. As noted, on their 2013 income tax return they claimed a theft loss deduction of $1,196,000, but on brief they assert a theft loss deduction for tax year 2013 of $1,775,000.  In support of this claim they rely on the report of their expert witness, Mr. Andrew S. MacCuish.

Mr. MacCuish is a real estate appraiser licensed in the State of California. His report, prepared in 2018, undertakes to value the Prefumo property retrospectively as of June 1, 2006, by reference to what he identified as five sales of comparable residential property.  He opined that as of June 1, 2006, when Mrs. Littlejohn purchased the Prefumo property for $2.5 million, its then-existing

---

[29]The evidence in the record does not suggest that this seemingly reduced sale price can be explained by a general decline in the real estate market.  To the contrary, the report of petitioners' expert witness states:  "The peak of the real estate market occurred in the first half of 2005, with a slowed appreciation continuing through the first half of 2006."

[*41] defects caused it to be really worth only $800,000.[30]  In arriving at this appraised value, Mr. MacCuish discounted three of his comparables by $1,755,000 to account for the supposedly poor condition of the Prefumo property as of the time Mrs. Littlejohn purchased it.[31]  Mr. MacCuish's report states that this $1,755,000 discount was based upon "the assumption * * * there were defects and repairs required" for the Prefumo property when Mrs. Littlejohn purchased it.  His report further indicates that the $1,755,000 discount represents the sum of "Repair costs 2006" ($1,225,000), "Water Well" ($250,000), "15%" ($150,000), and "Profit (entrepreneurial)" ($130,000).  Questioned at trial about this $1,755,000 discount, Mr. MacCuish offered no detailed explanation but rather stated that it was a "pretty close ball park".

Petitioners assert that the fair market value of the Prefumo property "before the discovery of the fraud" was $2.5 million--the amount Mrs. Littlejohn agreed to pay for the property.  On the basis of Mr. MacCuish's expert report they assert that the fair market value of the property "after the discovery of the fraud" was only

---

[30]Mr. MacCuish's report states that his $800,000 appraised value is "below the estimated site value.  This can be attributed to the cost of demolition, transportation of debris, and disposal site charges."

[31]Mr. MacCuish discounted two other comparables (which he classified as being in worse condition than the other three comparables) by only $1 million each.

[*42] $800,000.  Citing sections 1.165-7(b) and 1.165-8(c), Income Tax Regs., petitioners assert, with eccentric math, that this means that they sustained a total loss of "more than $1.7 million."

From this line of argumentation it is apparent that the theft which petitioners have alleged is not a theft of the Prefumo property directly but rather of a portion of its purchase price--the amount by which they contend that Mrs. Littlejohn was overcharged for the Prefumo property.  Consequently it appears that the claimed 2013 theft loss deduction duplicates the theft loss deduction claimed for tax year 2010 and fails to take into account the $200,000 of total settlement proceeds received in December 2013 from the Staniers and Ms. Wilson.

But even setting those problems aside, petitioners have failed to substantiate the amount of any supposed 2013 theft loss.  On brief their reported, alleged theft loss goes from being "more than $1.7 million" to being exactly $1,775,000--a number that is apparently based (although seemingly with a typographical error) on the $1,755,000 discount used in Mr. MacCuish's expert report.  Petitioners have not adequately explained, however, how Mr. MacCuish's $1,755,000 discount translates into a theft loss in conformance with the requirements of sections 1.165-7(b) and 1.165-8(c), Income Tax Regs.

[*43] The largest component of Mr. MacCuish's $1,755,000 discount is his $1,225,000 repair cost estimate. His report indicates that this estimate is based on a report of a structural engineer, who in turn based his report on cost estimates produced by another company, J.M. Reiss, Inc. Neither the structural engineer nor any representative of J.M. Reiss, Inc., was called as a witness. The $1,225,000 repair estimate incorporated in Mr. MacCuish's analysis is unsubstantiated and much greater than the (also unsubstantiated) $800,000 repair estimate included in the $1,196,000 theft loss deduction that petitioners claimed on their 2013 income tax return. Petitioners have offered no explanation for the difference. They have not only failed to substantiate the repair expenses allegedly paid or incurred; they have also failed to show that any such repair expenses were not excessive, did not cover more than the damage suffered, and did not increase the value of the property by more than any supposed diminution in the property's value resulting from any purported criminal actions. Cf. sec. 1.165-7(a)(2)(ii), Income Tax Regs. (describing requirements for measuring a casualty loss by reference to repair costs).

Likewise, there is no meaningful explanation as to how Mr. MacCuish came up with the $250,000 cost of a well replacement or, for that matter, how he ascertained that the well needed to be replaced at the time Mrs. Littlejohn

**[*44]** purchased the property. Similarly, Mr. MacCuish's report does not adequately explain what is meant by "Contingency 15%" or "Profit (entrepreneurial)" or how the amounts assigned to those classifications were determined.[32] He referred to a formula he found in a book but did not explain exactly how any such formula was warranted or applied in this case.

In short, Mr. MacCuish's expert report, based on unexplained assumptions and third-hand information, is insufficient to substantiate petitioners' claimed theft loss. The record contains no other competent evidence by which to reliably measure or estimate the amount of any supposed theft loss.

For these reasons, we sustain respondent's disallowance of petitioners' claimed theft loss deduction for tax year 2013.

IV. <u>Section 6662(a) Accuracy-Related Penalties</u>

Respondent determined that for each tax year at issue petitioners are liable for a 20% accuracy-related penalty pursuant to section 6662(a). Under section 7491(c), respondent bears the burden of production with respect to the section

---

[32]Mr. MacCuish testified vaguely that the concept behind his methodology is illustrated by the example of "people that are flipping houses to make a profit", who might insist on a discount in buying damaged property in order to make a profit. There is no indication in the record that Mrs. Littlejohn purchased the Prefumo property with an intention to flip it. It is also unclear why the unexplained "Contingency" is quantified as 15%. We observe that $150,000 is 15% of $1 million, a figure that does not otherwise appear in these calculations.

[*45] 6662(a) penalty.  Generally, this means that he must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  The Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b).  Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).  Once the Commissioner has met his burden of production, the burden of proof is upon the taxpayer to show that he is not liable for the penalty.  See Higbee v. Commissioner, 116 T.C. at 449.  The taxpayer may meet this burden by proving that he acted with reasonable cause and in good faith with regard to the underpayment.

The parties have stipulated the Civil Penalty Approval Form whereby the revenue agent's manager approved in writing the assertion of the accuracy-related penalty under section 6662(a) and (b)(1) and (2) for negligence and a substantial understatement for each of petitioners' tax years 2010 through 2013 on January 4, 2016, before the notice of deficiency was issued on March 2, 2016.  Petitioners have not alleged and the record does not support a conclusion that respondent formally communicated his initial penalty determination to petitioners before January 4, 2016.  Consequently, we hold that respondent has complied with the

[*46] requirements of section 6751(b)(1) with respect to the section 6662(a)

accuracy-related penalties for negligence and substantial understatements.[33]  See

Frost v. Commissioner, 154 T.C. __ (Jan. 7, 2020).

Since respondent complied with the requirements of section 6751(b)(1), we

now turn to the remainder of respondent's initial burden under Higbee.

In this proceeding respondent asserts that petitioners were negligent for

each tax year at issue and substantially understated their income tax for tax year

2013.  Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty

on the portion of an underpayment that is due to negligence or intentional

disregard of rules or regulations or due to any substantial understatement of

income tax.  Negligence includes a failure to attempt reasonably to comply with

the Code.  See sec. 6662(c).  Disregard includes careless, reckless, or intentional

disregard.  See id.  There is a "substantial understatement" of income tax for an

individual for any tax year if the amount of the understatement exceeds the greater

---

[33]Given that we conclude that respondent has met his burden of production for imposing the sec. 6662(a) penalties based on negligence for all tax years at issue and a substantial understatement for tax year 2013, and we sustain the sec. 6662(a) penalties on those grounds, we need not consider whether respondent has met his burden of production with respect to the accuracy-related penalties as to any other ground.

[*47] of: (1) 10% of the tax required to be shown on the return for the taxable year or (2) $5,000.

The evidence convinces us that for each tax year at issue petitioners failed to make a reasonable attempt to comply with the provisions of the Code and failed to keep adequate books and records. Accordingly, we hold that respondent has met his burden of production to show that petitioners' underpayment for each tax year at issue was attributable to negligence.

Moreover, for tax year 2013 petitioners reported zero tax liability. Even with respondent's concessions, it is apparent that petitioners' understatement for tax year 2013 will exceed 10% of the tax required to be shown on their return, which is greater than $5,000. Accordingly, we hold that for tax year 2013 respondent has met his burden of production to show that petitioners' underpayment for tax year 2013 was also attributable to a substantial understatement of income tax.

No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith with respect thereto. See sec. 6664(c)(1). The taxpayer generally bears the burden of proving reasonable cause and good faith. Higbee v. Commissioner, 116 T.C. at 446-447. Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax

[*48] professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs. Reliance on a tax adviser may be reasonable and in good faith if the taxpayer establishes: (1) The adviser was a competent professional with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Our determinations regarding petitioners' tax deficiencies turn on two key issues: (1) whether petitioners properly substantiated expenses underlying their Schedule E deductions; and (2) whether they are entitled to theft loss deductions for their tax years 2010 and 2013. Petitioners have not shown that they provided Mr. Kloster necessary and accurate information as to certain critical matters regarding these issues. Moreover, it appears that Mr. Kloster unreasonably relied on certain of Mr. Littlejohn's representations.

More particularly, Mr. Kloster prepared petitioners' returns using worksheets that Mr. Littlejohn had provided him. These worksheets listed income and expense items, which Mr. Kloster summarized for his computer inputs.

**[*49]** Petitioners did not provide Mr. Kloster the underlying documents relating to the expenses listed on the worksheets, and Mr. Kloster did not independently verify the numbers on those worksheets.[34]

With respect to petitioners' claimed theft loss deduction for tax year 2010, it appears that Mr. Kloster accepted at face value Mr. Littlejohn's characterization of the default judgment against Mr. King as being noncollectible at the end of tax year 2010 and also accepted at face value that this was a "fraud loss". Similarly, Mr. Kloster testified that he relied upon Mr. Littlejohn to determine the theft loss amount for tax year 2013. Mr. Kloster testified that, consistent with his usual business practice, he did not prepare an opinion letter for petitioners, and nothing in the record indicates that petitioners even asked him to opine on the validity of the claimed theft losses. Cf. DJB Holding Corp. v. Commissioner, 803 F.3d 1014, 1030 (9th Cir. 2015) (finding no reasonable cause and "nothing in the record indicat[ing] that Taxpayers even asked the accountant for such an opinion"), aff'g T.C. Memo. 2011-36; Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100 ("The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported

---

[34]On brief petitioners claim that some of their documentation was lost by a third party, but Mr. Kloster's testimony did not indicate that he had been made aware of any lost documentation.

**[\*50]** therein."). Petitioners have not met their burden of showing reasonable reliance on Mr. Kloster's advice.

Petitioners have failed to show reasonable cause or any other basis for reducing the penalties. We hold that they are liable for the section 6662(a) penalties for the tax years at issue commensurate with the concessions and our other holdings.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.